# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CELESTE D. GARNER, individually and on behalf of all others similarly situated, | ) | |
| | ) | |
| PLAINTIFF, | ) | 2:01-CV-00712-VEH |
| VS. | ) | |
| CAPITAL ONE BANK, | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OF DECISION

The court has before it two motions (docs. #30 and 54) for summary judgment by defendant Capital One Bank.  The motions are deemed submitted, without oral argument.[1]

## I. Procedural History

Plaintiff Celeste D. Garner commenced this action, on behalf of herself and others similarly situated, on March 23, 2001 by filing a complaint in this court alleging a violation of section 1642 of the Truth in Lending Act, 15 U.S.C. §§

_____

[1] Although Judge Bowdre set the motions for summary judgment for oral argument (see doc. #63), apparently, that argument never occurred.

1601 <u>et. seq.</u>, (TILA) and alleging civil conspiracy under Alabama law.[2]  The

complaint also asks for injunctive relief.  The case was originally assigned to

Judge H.D. Buttram.  Plaintiff later amended her complaint to add an allegation of

a violation of section 1637 of the TILA.  Defendant's first motion for summary

judgment asserts that plaintiff cannot prevail on her claim under section 1642

because it did not issue plaintiff a credit card.  Defendant's second motion for

summary judgment asserts that plaintiff cannot prevail on either claim because

they are barred by the statute of limitations.  Defendant argues in the alternative

that the section 1637 claim fails because defendant did not open a new account,

but purchased and was assigned plaintiff's existing account, and that defendant

timely disclosed the required information.[3]

Both parties have filed briefs and submitted evidence in support of their

respective positions.  Defendant submitted a brief (doc. # 31) and evidence[4] (doc.

# 32) in support of its first motion for summary judgment on October 19, 2001,

---

[2] In its brief in opposition to the first motion for summary judgment, plaintiff states that "there is no longer a viable conspiracy claim in this action" because the other party was dismissed.  Therefore, the court will not consider this claim.

[3] Defendant also argues that plaintiff cannot prove a violation of either section because defendant is not a creditor against whom plaintiff could bring her claims.

[4] The defendant submitted the following evidence: deposition of Celeste D. Garner with exhibits; deposition of James Timme with exhibits and the continuation of that deposition; and affidavit of Mercury Williams.

and October 18, 2001, respectively.  Defendant supplemented its evidentiary submission[5] (doc. #33) on October 23, 2001.  On November 8, 2001, plaintiff filed a brief (doc. # 42) and evidence[6] in opposition to defendant's first motion for summary judgment.  After plaintiff filed her opposition, on November 14, 2001, the case was reassigned to Judge Karen O. Bowdre.  On November 30, 2001, defendant filed a brief (doc. # 49) in reply to plaintiff's opposition.

Defendant submitted a brief (doc. #55) and evidence[7] (doc. #56) in support of its second motion for summary judgment on December 14, 2001.  On January 11, 2002, plaintiff submitted a brief (doc. # 79) and evidence[8] (doc. #59) in opposition to defendant's second motion for summary judgment.  On January 25, 2002, defendant submitted a brief (doc. #65) in reply to plaintiff's opposition.

---

[5] The defendant corrected its earlier evidentiary submission to include the exhibits to the continuation of the deposition of James Timme.

[6]  The plaintiff submitted the following evidence: deposition of Celeste D. Garner; deposition of James Timme and the continuation of that deposition; and deposition of Thomas Kim with exhibits.

[7] The defendant submitted the following evidence: second affidavit of Mercury Williams with exhibits.

[8] The plaintiff submitted the following evidence: deposition of James Timme; deposition of Celeste Garner; second deposition of James Timme; May 1995 letter to Gump customers; Notice of Change in Terms Sheet; July 1999 letter to former Gump customers; Capital One billing statement; September 1, 1999 changes to account; May 11, 2000 Garner letter to Capital One; May 11, 2000 letter to postal inspector; response by Alabama Attorney General's Office to Garner's complaint; and June 2000 letter from Anthony Cicio to Capital One.

After all the briefs were submitted, but before the motions had been ruled on, on October 14, 2003, the case was reassigned to Judge R. David Proctor.  Then, on June 28, 2004, the case was reassigned to the present district court judge.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All

4

reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus

5

demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. See Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. See Lewis v. Casey, 518 U.S. 343, 358 (1996)

6

(citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[9]

From 1996 until 1999, Garner had a credit account with Gump's By Mail, the mail order division of a California department store.  (Garner Dep. at 50; Ex. 6 to Garner Dep.)  Garner did not have a credit card with her account; she made purchases by referencing her account number.  (Garner Dep. at 32, 35.)  General Electric Capital Corporation serviced Garner's account under the agreement governing the credit account.  (Ex. 9 to Garner Dep.)  The agreement stated that Gump's had the right to sell or assign Garner's account "at any time."  (<u>Id.</u>)  The agreement also provided that the Gump account could be changed "at any time" and any new terms could be applied to existing balances at the time of the change. (<u>Id.</u>)

In May 1999, Capital One mailed a notice to all Gump's account holders informing them that Capital One "will purchase and begin servicing" all Gump accounts on July 7, 1999.  (Williams Aff. ¶ 3; Ex. 1 to Williams Aff.; Ex. 22 to Garner Dep.)  Although Capital One had her correct address, Garner contends that

---

[9] If the facts are in dispute, they are stated in a manner most favor to the non-movant.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115.

7

she never received this notice.[10]  (Garner Dep. at 100-02, 107-08, 111.)  In late

July 1999, Capital One mailed another notice alerting former Gump's account

holders that the transfer had been accomplished and that the terms of their

accounts would be changed.  (Williams Aff. ¶ 4; Ex. 2 to Williams Aff.; Ex. 23 to

Garner Dep.)  This notice contained a detachable form by which any account

holder could choose not to accept the change in terms.[11]  (Williams Aff. ¶ 8; Ex. 2

to Williams Aff.; Ex. 23 to Garner Dep.)  Garner contends that she never received

this notice, although she acknowledge that Capital One had her correct address.

(Garner Dep. at 100-02, 107-08, 111.)  Garner did not remit the detachable form to

Capital One expressing her decision to opt out of the transfer, and Capital One

continued to service her account after the transfer on July 7, 1999.  (Williams Aff.

¶ 6.)  Just like her account through Gump's, Capital One never issued Garner a

credit card.  (Garner Dep. at 31-32; Timme Dep. at 115; Williams Aff. ¶ 7.)

Capital One gave Garner's account most of the same terms that it had before

---

[10] The record does not contain the actual notice that was mailed to Garner.  Instead, the record reflects form letters that Capital One contends it mailed to all Gump account holders. Garner does not dispute that these notices were sent.  (Pl. Opp. to Second Motion at 3.)  She merely contends that she did not receive them.  She did acknowledge, however, that the address that Capital One had for her, the address where Capital One sent her statements, was her correct address.  (Garner Dep. at 100-03.)

[11] If the account holder chose not to accept the new terms, the account holder would retain the previous terms until the account balance was paid in full, and then the account would be closed.  (Timme Dep. at 63.)

the transfer.  (Timme Dep. at 113-16.)  One of the changes was to the balance interest rate.  With her Gump's account, Garner had a tiered balance rate, whereby the first $1,000 was subject to 18% APR and any balance above that amount was subject to a 12% APR.  (Ex. 9 to Garner Dep.; Timme Dep. continuation at 29.) Capital One, however, does not use tiered rates and applied the lower 12% APR rate to all purchases.  (Timme Dep. continuation at 29-32.)  Another change to her account was a cash advance credit line of $5,000.  (Ex. 8 to Garner Dep.)  A third change, added in September 1999, was a $25 late fee provision.  (Timme Dep. at 33.)

About four months after Capital One began servicing her account, in November 1999, Garner purchased a ceramic flower pot from Gump's and charged the cost, $76.50, to her credit account.  (Compl. ¶ 8; Garner Dep. at 41, 99-100.) The $76.50 charge was reflected on her monthly billing statement that Capital One mailed to Garner in December 1999.  (Garner Dep. at 99-100.)  Although the address on the billing statement was accurate, Garner testified that she never received the statement.  (Id.)  She further testified that she did not receive the statements for December 1999 through January 2000, January through February 2000, or February through March 2000, although she admitted that her name and address were correct on the statements produced by Capital One.  (Id. at 101-03;

9

Exs. 7, 17-19 to Garner Dep.)

Garner did receive her statement for the period of March 26 through April 25, 2000.[12]  (Garner Dep. at 102-04.)  She noticed that the balance was $155.31 for Shop Extra MasterCard account number 5291-5615-7558-5227.  (Id. at 104-05; Ex. 8 to Garner Dep.)   The balance included the initial charge for the ceramic pot, late fees and finance charges.  (See id.)  Garner testified that she was upset because Capital One opened this MasterCard account for her without her authorization, did not bill her for months after she made the purchase so that late fees and finance charges accrued, and that Capital One made negative reports to credit agencies that damaged her credit rating.  (Garner Dep. at 114-15, 117, 122, 133-34.)

On May 11, 2000, Garner complained by letter to Capital One about the charges, and Capital One responded.  (Id. at 59-62, 118-19; Exs. 11-12, 24 to Garner Dep.)  On May 30, 2000, Capital One resolved Garner's complaints by removing all the charges that she contested.  (Garner Dep. at 42, 105-06; Ex. 21 to Garner Dep.)  Garner never paid a late fee or finance charge.  (Garner Dep. at 126.)  In fact, she never paid the original charge of $76.50 for the flower pot.  (Id.

---

[12]  Garner testified that from that point forward, she received every statement mailed to her by Capital One.  (Garner Dep. at 104-15; Exs. 13, 20-21 to Garner Dep.)

at 42, 106, 126.)  After her balance was erased, Garner's account was closed, and Capital One told Garner that it had "contacted the credit bureau agencies and requested that they delete all the derogatory information that was reported on [her] credit file from January 2000 until May 2000."  (Ex. 12 to Garner Dep.)

## IV. Applicable Substantive Law and Analysis

Garners's complaint contains the following claims: (1) violation of section 1642 of TILA and (2) violation of section 1637 of TILA.   Capital One first argues that both claims are barred by the one year statute of limitations.  In the alternative, as to the section 1642 claim, Capital One argues that it fails because Capital One did not issue Garner a "credit card."  Also in the alternative, as to the section 1637 claim, Capital One contends that this claim fails because it did not "open" a new account and that it made the required disclosures.[13]  The court addresses each argument in turn.

### A. Statute of Limitations

Garner contends that Capital One violated two sections of TILA: (1) section 1642 and (2) section 1637.  She alleges that Capital One violated section 1642 when it "issued" Garner a "credit card" in July 1999.  (Am. Compl. ¶ 27.)  She

---

[13] Capital One also contends that it is not a "creditor" against whom Garner could bring her claims under the statute.  The court will not address this claim as the court concludes that summary judgment is due to be granted for other reasons.

alleges that Capital One violated section 1637 when it failed to make initial disclosures when it "opened" her account in July 1999.  (Id.)  Section 1640(e) of TILA states in relevant part: "[a]ny action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."  15 U.S.C. § 1640(e).  According to the allegations in the amended complaint, any violation of sections 1642 and 1637 occurred in July 1999, more than one year before Garner filed her complaint on March 23, 2001.

Garner argues, however, that the limitations period should be tolled until sometime in late April or early May 2000, when she alleges that she first received a monthly statement from Capital One.  (Pl. Opp. Br. to Second Mot. at 7.)  The Eleventh Circuit has held that "the statute of limitations in TILA is subject to equitable tolling" when the violation of TILA is either self-concealing or is fraudulently concealed by the defendant.   Ellis v. Gen. Motors Acceptance Corp., 160 F.3d 703, 708 (11th Cir. 1998).  Equitable tolling is the doctrine which allows plaintiffs to sue after the expiration of the applicable statute of limitations, provided they have been prevented from doing so due to inequitable circumstances.  See id. at 706 (citing Bailey v. Glover, 88 U.S. 342, 347 (1874)).  The purpose underlying equitable tolling is to prevent defendants from

12

"concealing a fraud, or . . . committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations."  Bailey, 88 U.S. at 349.

Garner, however, has not alleged, nor produced evidence, that Capital One fraudulently concealed any violation of TILA.  Garner does not address this omission, but instead, argues that her claim should survive the statute of limitations because she did not have any knowledge of the alleged violation under late April or early May 2000, when she received her first statement from Capital One.  Garner did not, however, supply the court with any case law, from the Eleventh Circuit or otherwise, that allows tolling of the statute of limitations under TILA merely because of a lack of notice.[14]  The only case law regarding the tolling of the limitations under TILA allows for it in the limited circumstance of when the violation is either self-concealing or is fraudulently concealed by the defendant. See, e.g., Ellis, 160 F.3d at 708; Kelley v. Galveston Autoplex, 196 F.R.D. 471, 478 (S.D. Tex. 2000); Pettola v. Nissan Motor Acceptance Corp., 44 F. Supp. 2d 442, 450 (D. Conn. 1999); Evans v. Rudy-Luther Toyota, Inc., 39 F. Supp. 2d 1177, 1184 (D. Minn. 1999); Jones v. Saxon Mortgage, Inc., 980 F. Supp. 842,

---

[14] In addition, the court has been unable to find any case law supporting Garner's tolling argument.

846 (E.D. Va. 1997), aff'd, 161 F.3d 2 (4th Cir. 1998) (table).

Although case law is lacking, the court is somewhat persuaded by Garner's argument. It makes sense that Garner should have a year from the time she knew or should have known of the alleged violation to sue. See King v. State of California, 784 F.2d 910, 915 (9th Cir. 1986) ("the doctrine of equitable tolling may, in the appropriate circumstances, suspend the limitation period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that formed the basis of the TILA action"); Cox v. Adm'r, U.S. Steel, 17 F.3d 1386, 1412 (11th Cir. 1994) (under RICO, the "statute of limitations accrues when, in the exercise of reasonable diligence, the claimant knew of should have known of the injury."). Unfortunately for Garner, even if tolling was permitted under these circumstances, she has not produced evidence to overcome the "rebuttable presumption that an item properly mailed was received by the addressee." Konst v. Florida East Coast Ry. Co., 71 F.3d 850, 851 (11th Cir. 1996).

Capital One produced evidence sufficient to raise this rebuttable presumption. Capital One produced evidence that it mailed an initial notice on May 22, 1999, a notice of a subsequent change in terms on July 26, 1999, a "welcome kit" that included form disclosures in September 1999, and monthly

14

statements in December 1999, January 2000, February 2000, and March 2000. (Williams Second Aff. ¶¶ 3-5; Garner Dep. at 100-05; Exs. 7, 17-20 to Garner Dep.)  Although Garner testified that she did not receive anything from Capital One until late April or early May 2000, she admitted that each monthly statement, produced by Capital One with her name and address, were properly addressed, and that she received every Capital One mailing with that same address after late April or early May 2000.  (Garner Dep. at 100-05, 199; Exs. 7, 13-21.)  This evidence is sufficient to raise the rebuttable presumption of receipt of the December 1999, January 2000, and February 2000 statements, mailed within the one year statute of limitations period.  In addition, Capital One produced evidence that it mailed an initial notice on May 22, 1999, a notice of a subsequent change in terms on July 26, 1999, and a "welcome kit" that included form disclosures in September 1999. Although Capital One produced only forms of these mailings, Garner does not dispute that these were mailed to her current address.  Instead, she maintains that she did not receive them.  This evidence is sufficient to raise the rebuttable presumption regarding these mailings.

Garner may rebut this presumption "by evidence that the [mailing was] never received."  Konst, 71 F.3d at 851 n.1; Barnett v. Okeechobee Hosp., 283 F.3d 1232, 1240 (11th Cir. 2002); Huizar v. Carey, 273 F.3d 1220, 1223 n.3 (9th

15

Cir. 2001).  "After all, the presumption of receipt is 'not a conclusive presumption of law, but a mere inference of fact, founded on the probability that the officers of the government will do their duty and the usual course of business; and, when it is opposed by evidence that the letters never were received, must be weighed with all the other circumstances of the case . . . in determining the question whether the letters were actually received or not.'"  Barnett, 283 F.3d at 1240 (quoting Rosenthal v. Walker, 111 U.S. 185, 193-94 (1884)).

Garner has not produced evidence sufficient to rebut the presumption. Garner testified that she never received the mailings.  This testimony is insufficient.[15]  Akey v. Clinton County, New York, 375 F.3d 231, 235 (2d Cir. 2004) ("Denial of receipt, without more, is insufficient to rebut the presumption.") (citing Meckel v. Cont'l Res. Co., 758 F.2d 811, 817 (2d Cir. 1985)); see Barnett, 283 F.3d at 1240; Huizar, 273 F.3d at 1223 n.3 ("Merely stating that the document isn't in the addressee's files or records is insufficient to defeat the presumption of receipt."); Schikore v. BankAmerica Supplemental Ret. Plan, 269 F.3d 956, 961 (9th Cir. 2001) (applying the common law mailbox rule where a retirement plan claimed it never got an employee's form for ERISA benefits).  In her brief in opposition to the second motion for summary judgment, she argues that the "flurry

---

[15] If this testimony were sufficient, the presumption would be rendered meaningless.

of activity" that followed the receipt of her statement in late April or early May rebuts the presumption.  (Br. in Opp. to Second Mot. at 10.)  That Garner began to protest when she received this statement, however, does not establish that she never received the other mailings.  Instead, the inference to be drawn from this evidence is that Garner began to appreciate the problem of accruing finance charges at that time.  Garner failed to offer sufficient evidence that "the [mailings] never were received," and the presumption of receipt remains unrebutted.  Garner, therefore, should have known of the alleged violations by July 1999, when the change of terms was mailed, or, at the very latest, by December 1999, when her first statement was mailed.  Because she did not file her complaint until March 23, 2001, more than a year from the time she should have known of the alleged violations, Garner's claims do not survive the statute of limitations.

## B.  Section 1642

Even if Garner's claim under section 1642 were not barred by the statute of limitations, Capital One would still be entitled to summary judgment on the merits. Section 1642 of TILA states that "[n]o credit card shall be issued except in response to a request or application therefor.  This prohibition does not apply to the issuance of a credit card in renewal of, or in substitution for, an accepted credit card."  15 U.S.C. § 1642.  Under the statute, a "credit card" is a "card, plate

coupon book or other credit device existing for the purpose of obtaining money, property, labor or services on credit."  15 U.S.C. § 1602(k).  Similarly, the regulation which implements TILA's substantive provisions, Regulation Z, defines a "credit card" as "any card, plate, coupon book or other single credit device that may be used from time to time to obtain credit."  12 C.F.R. § 226.2(a)(15).

It is undisputed that Capital One did not issue Garner any card, plate or coupon book.  (See Garner Dep. at 31-32.)  Garner testified at her deposition that she never received a credit card from Capital One: "I never received a plastic credit card from Capital One . . . .  I didn't have a Capital One MasterCard."  (Id.) Garner contends, however, that her Capital One account constituted a "credit card" under the statute because it was a "credit device."  (Pl. Opp. Br. to First Mot. at 11-12.)  The court disagrees for two reasons.[16]

First, all of the examples of a "credit device" are tangible objects. Regulation Z interprets the term "credit device" to include "a blank check, payee-designated check, blank draft or order, or authorization form for issuance of a check."  12 C.F.R. § 226.9(b)-2.  Capital One did not issue Garner any such "credit device."  Garner's argument rests upon a misreading and misquotation of

---

[16] The court also rejects Garner's argument regarding the substitution of an "accepted credit card" for the reasons stated in Capital One's reply brief.

the regulation.  She quotes the portion of the regulation that deals with "credit features."  (Pl. Opp. Br. to First Mot. at 11.)  Credit features are different than credit devices.  "Credit features" are aspects of credit accounts, whether or not those accounts are accompanied by credit cards.  <u>See</u> 12 C.F.R. § 226.9(b)-2.  The court, therefore, rejects Garner's argument regarding credit devices.

Second, Garner's argument fails because her account is an "open end credit plan" as defined by TILA and Regulation Z; it is not a "credit card."  An "open end credit plan" is "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance."  15 U.S.C. § 1602(I).  Garner's account squarely fits this definition, as it was a "plan" under which she could make repeated transactions and for which she could be charged certain fees.[17]  Garner has not come forward with evidence to dispute this fact.

Because Garner's account constituted an "open end credit plan," it is not a "credit card" under the statute.  The statute defines each term separately.  <u>Compare</u> 15 U.S.C. § 1602(k) <u>with</u> § 1602(i).  Both the statute and the regulation refer to

_____

[17]  Garner's argument under section 1637 essentially admits that her account is an open end credit plan and not a credit card.

open end credit plans that involve, or do not involve, a credit card.  <u>See</u> 15 U.S.C.

§ 1602(f); 12 C.F.R. 226.12(a)(2).  If the terms were intended to have the same

meaning, the statutory language would be redundant, a result disfavored in the

law.  <u>See</u> <u>Gustafson v. Alloyd Co., Inc.</u>, 513 U.S. 561, 574 (1995); <u>Bouchard</u>

<u>Transp. Co., Inc. v. Updegraff</u>, 147 F.3d 1344, 1351 (11th Cir. 1998).  Instead, the

court must "give effect, if possible, to every clause and word of a statute."

<u>Culpepper v. Irwin Mortgage Co.</u>, 253 F.3d 1324, 1329 (11th Cir. 2001).

In summary, Garner's account does not constitute a credit card under TILA.

Because Capital One did not issue Garner a credit card, it did not violate section

1642.  As such, even if the claim were not barred under the statute of limitations,

summary judgment would be due to be granted on the merits of Garner's section

1642 claim.

## B.  Section 1637

Similarly, even if Garner's section 1637 claim were not barred by the statute

of limitations, Capital One would be entitled to summary judgment on the merits.

Garner contends that Capital One did not make the required disclosures before it

opened her account. Capital One argues that it made the required disclosures

within the time prescribed by the statute.

Section 1637 prefaces its list of required disclosures with the admonition

"[b]efore opening any account . . . ."  15 U.S.C. § 1637(a).  Regulation Z states

that the relevant disclosures should be made "[b]efore the first transaction is made

on any open end credit account."  12 C.F.R. § 226.5(b)(1).  The official

commentary states as follows:

> The rule that the initial disclosure statement must be furnished 'before
> the first transaction' requires delivery of the initial disclosure
> statement before the consumer becomes obligated on the plan.  For
> example, the initial disclosures must be given before the consumer
> makes the first purchase . . . receives the first advance, or pays any
> fees or charges under the plan other than an application fee or
> refundable membership fee . . . .

Supp. I, 12 C.F.R. § 226.5(b)(1)-1.  Garner argues that the regulation and official

commentary conflict with the statute's clear language.  (Pl. Opp. Br. to Second

Mot. at 15-16.)  At first glance this argument seems to have merit.  However, a

closer examination of the statute, regulation and commentary, and the law on

statutory interpretation results in the opposite conclusion.

In <u>Ford Motor Credit Co. v. Milhollin</u>, the Supreme Court recognized "an

unmistakable congressional decision to treat administrative rulemaking and

interpretation under TILA as authoritative."  444 U.S. 555, 567-68 (1980).  In

addition, the Court found that the "language in the legislative history evinces a

decided preference for resolving interpretive issues by uniform administrative

decision, rather than piecemeal through litigation."  <u>Id.</u> at 568 (citing S.Rep.No.

93-278, at 13-14; 122 Cong.Rec. 2852 (1976) (remarks of Rep. Annunzio); 121

Cong.Rec. 36927 (1975) (remarks of Rep. Annunzio)). The Court directed

"[c]ourts [to] . . . honor that congressional choice" and "while not [to] abdicat[e]

their ultimate judicial responsibility to determine the law, . . . to refrain from

substituting their own interstitial lawmaking for that of the Federal Reserve, so

long as the latter's lawmaking is not irrational." Id. (internal citation omitted).

The court reviews an agency's interpretation of a federal statute by using the

two-step process articulated by the Supreme Court in Chevron. Southern Co. v.

F.C.C., 293 F.3d 1338, 1343 (11th Cir. 2002). The Chevron test, at it is called,

requires the following:

> Chevron's first step requires the court to ascertain whether Congress
> has spoken unambiguously "to the precise question at issue." If the
> language of the statute is unambiguous, we go no further, for we must
> give effect to clear congressional intent. If, however, we determine
> that Congress's intent is ambiguous as to the question at issue, we
> must move on to the second step of the Chevron test and ask whether
> the agency's interpretation of congressional intent is reasonable.

Id. (citing Chevron, 467 U.S. at 842-43). The first step, therefore, is to determine

whether the language of section 1637 is clear or in need of agency interpretation.

"[T]he starting point for interpreting a statute is the language of the statute itself."

Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980).

Moreover, "[a]s a basic rule of statutory interpretation, we read the statute using

22

the normal meanings of its words . . . . '[A]bsent a clearly expressed legislative intent to the contrary, that language is generally dispositive.'" <u>Consolidated Bank, N.A. v. United States Dep't of Treasury</u>, 118 F.3d 1461, 1463 (11th Cir. 1997) (quoting <u>Gonzalez v. McNary</u>, 980 F.2d 1418, 1420 (11th Cir. 1993)).

Section 1637 states that the disclosures are required when an account is opened.  The statute, however, does not define the term "open."  In this case, as Capital One points out, Garner first "opened" the account at issue in 1996 with Gump's.  She never opened an account with Capital One.  Instead, Capital One bought her already opened account from Gump's.  Of course, Capital One did begin servicing her account on July 7, 1999, changed her Gump's account into a MasterCard account, and changed some of the terms of the account.  It is unclear to the court exactly when Capital One "opened" her account under the statute, and, therefore, was required to send the disclosures.  Because Congress's intent is ambiguous regarding this situation, the must "ask whether the agency's interpretation of congressional intent is reasonable."  <u>Southern Co.</u>, 293 F.3d at 1343.

The question, therefore, becomes whether the interpretation in Regulation Z of when the disclosures are required is irrational.  TILA's declaration of purpose states, in relevant part:

> The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms . . . would be strengthened by the informed use of consumer credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

15 U.S.C. § 1601(a).  The regulation and commentary provide that an account is opened when the consumer becomes obligated under the open end credit plan.  See 12 C.F.R. § 226.5(b)(1); Supp. I, 12 C.F.R. § 226.5(b)(1)-1.  That obligation can occur with the first transaction, the first advance, or when the consumer is charged a fee or other nonrefundable charge under the plan.  See Supp. I, 12 C.F.R. § 226.5(b)(1)-1.

Although the court can think of other ways to define when an account is "opened," it is not the province of the court to "substitut[e] [its] own interstitial lawmaking for that of the Federal Reserve."  Ford Motor Credit Co., 444 U.S. at 568.  The purpose of the disclosure requirements is to allow consumers "to compare . . . various credit terms[,] . . . [to] avoid the uninformed use of credit, and to protect . . . against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).  This purpose is accomplished by requiring that the

disclosures are made at some point before the consumer becomes obligated on the account.  Garner has not come forward with any reason, and the court can think of none, why the regulation is irrational.[18]

The court must now determine whether the disclosures made by Capital One were timely.[19]  It is undisputed that Capital One mailed the required disclosures in late July 1999.  (Williams Second Aff. ¶ 4; Ex. 2 to Williams Second Aff.; Garner Dep. Ex. 23.)  Capital One began servicing Garner's account in early July 1999, and Garner did not make a purchase until November 1999, well after the disclosures were mailed.  The disclosures, therefore, were timely.  As such, even if this claim were not barred by the statute of limitations,  summary judgment would be due to be granted on the merits of Garner's section 1637 claim.

In summary, the court finds that no material issues of fact remain and that defendant Capital One is entitled to judgment as a matter of law as to all claims asserted by plaintiff.

A separate order will be entered.

---

[18] Although Garner contends that the Seventh Circuit found that the regulation and official commentary were "demonstrably irrational" (Pl. Opp. Br. to Second Mot. at 15 n.4), the court disagrees.  Instead, the Seventh Circuit stated in the context of the tolling of the statute of limitations, that "[i]f, then, there is a violation of the Act in an open end credit plan, it occurs at the time the account is opened, or at the very latest, some time before the first transaction takes place."  Goldman v. First Nat'l Bank of Chicago, 532 F.2d 10, 20 (7th Cir. 1976).

[19]  Garner does not dispute the adequacy of the content of the disclosures.

**DONE** this 21 day of February, 2006.